In re Lee Randall KATZ, Debtor.

Lee Randall Katz, Plaintiff–Appellee,

v.

Illinois Student Assistance Commission, Defendant–Appellant.

No. 04–C–453–S.

United States District Court, W.D. Wisconsin.

Aug. 31, 2004.

David J. Hershman, for Plaintiff.

Owen R. Williams, Williams & Van Ells, Amery, WI, for Defendant.

## ORDER

SHABAZ, District Judge.

This is an appeal by defendant Illinois Student Assistance Commission from a fi-nal order of the Bankruptcy Court in an adversary proceeding to determine the dis-chargeability of the debtor's student loans as an "undue hardship" pursuant to 11 U.S.C. § 523(a)(8). The following is a summary of the undisputed relevant facts and procedural background.

## BACKGROUND

On April 17, 2001 husband and wife debtors Lee Randall Katz and Andrea Dawn Katz filed for bankruptcy. The Bankruptcy Court granted a general dis-charge on August 2, 2001. Mr. Katz moved to reopen his bankruptcy case on January 14, 2002, and the case was re-opened on January 29, 2002. The Illinois Student Assistance Commission filed a proof of claim in the amount of $21,936.61 on March 14, 2002. On April 22, 2004 the Bankruptcy Court held an adversarial hearing to determine the dischargeability of Mr. Katz's student loans on the basis that repayment would impose "undue hardship" within the meaning of 11 U.S.C. § 523(a)(8). At the conclusion of the hear-ing the Bankruptcy Court determined that the student loans were dischargeable. This appeal followed.

Mr. Katz is a full-time employee of Ex-press Scripts, Incorporated in Blooming-ton, Minnesota where he earns $12.41 per hour as a prior authorization representa-tive. He has worked for Express Scripts for one and a half years. He is good at his job. He receives very good monthly evalu-ations and a raise each year.

Mrs. Katz operates an unlicensed day-care service from their home for about thirty hours per week. At the time of the adversary proceeding she was caring for two children for which she received $2.00 per hour for one and $2.25 per hour for the other. She anticipated that she would be-

gin watching a third child beginning in May. She also watches the Katzs' own two children: a four-year-old and a newborn. Mrs. Katz will not be able to further expand her daycare service unless she becomes licensed. Prior to her daycare service Mrs. Katz worked full-time at F & M Bank where she earned $12.50 per hour. She left her job at the bank to pursue her dream of opening a daycare. Mr. Katz testified that his wife is not likely to seek outside employment in the near future "if she doesn't have to."

Mr. Katz graduated from Sangamon State University in Illinois with a bachelors degree in criminal justice in 1995. He received $16,500.00 in guaranteed student loans from 1993 to 1995. He hoped to use his criminal justice degree to become a police officer. However, because of persistent back problems he was unable to do so.

He first underwent back surgery in 1990. His back problems kept him from joining the U.S. Air Force following this surgery, but his doctor assured him that he could expect a full recovery. No one discouraged him from pursuing a career in law enforcement because of his back. Unfortunately, his back did not fully recover. He underwent a second surgery in 1997. Following the second surgery his doctor advised him that he would no longer be able to perform any job requiring heavy lifting. His condition left him unable to attend a police academy or secure any other job in law enforcement.

Fortunately, he is able to successfully perform his current occupation at Express Scripts. The job is of a sedentary nature. He sits at his desk in a comfortable chair and interacts with clients over the telephone. His back does not interfere with his job performance.

Mrs. Katz attended the University of Wisconsin–Stout for two years but left without earning a degree. She spent her time at UW–Stout completing a number of general requirements. She also received student loans. She has not sought discharge of her loans. The Katzs currently pay $100.00 per month on her student loans.

They own a three-bedroom, one-and-a-half-story home in Clear Lake, Wisconsin. Mr. Katz estimates the fair market value of their home to be between $90,000.00 and $95,000.00. The home is encumbered by a $78,000.00 mortgage which they reaffirmed following their general discharge.

Mr. Katz must commute 140 miles round-trip each day from his home in Clear Lake to his job in Bloomington, Minnesota. This trip is expensive. The Katzs spend about $468.00 per month on gas. The commute also causes considerable wear to his 1989 Grand Marquis, which has over 250,000 miles on it. Mr. Katz has been unable to find work closer to home. The Katzs have considered selling their house and moving closer to his place of employment. However, a similar three-bedroom house closer to Bloomington, Minnesota would cost considerably more and the Katzs have been unable to find a willing buyer for their current home.

The Katzs reported gross income of $38,766.00 last year. Consequently, they can afford to spend a budget of $2,000.00 per month. Their current monthly expenses include the following: a mortgage payment of $720.00 including tax and insurance; house maintenance, water/sewer, gas/electric, and garbage bills totaling about $270.00; auto insurance of $105.00; gas purchases, as previously noted, of $468.00; food purchases of $350.00; clothing purchases of $50.00 and medical/dental expenditures of $100.00—both Mr. and Mrs. Katz have diabetes.

They are also making loan payments of $343.00 per month on Mrs. Katz's 2000

Ford Windstar, a debt which they reaffirmed following their general discharge. They have about three years of payments to go. They pay $50.00 per month for a telephone. At the time of the hearing they were also paying $80.00 per month for two cell phones. Mr. Katz stated that he did not plan to renew one cell phone contract. This would drop the payment to $40.00 per month. The Katzs have a satellite dish and enjoy cable television at $50.00 per month. Since the general discharge they have accrued debt of $8,000.00 on a credit card co-signed by Mr. Katz's mother. Consequently, they must also make credit card payments of $200.00 per month. As previously mentioned they also pay $100.00 per month towards Mrs. Katz's student loans.

Mr. Katz's parents are retired. They help their son and his family with financial contributions each month. The Katzs also participate in Badgercare, Wisconsin's version of Medicare.

The poverty level for a family of four living in Clear Lake, Wisconsin is $18,660.00 per year—which the Katz family spends every six months. By his own admission, Mr. Katz is "not very good in the ways of finances." Nevertheless, Mr. Katz managed to make student loan payments of over $5,500.00 between 1997 and 2000.

## MEMORANDUM

■ Student loans are not dischargeable unless excepting them from discharge "will impose an undue hardship on the debtor and the debtor's dependents." § 523(a)(8). In order to establish undue hardship the debtor must demonstrate:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that the state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*In re Roberson*, 999 F.2d 1132, 1135 (7th Cir.1993) (quoting *Brunner v. New York State Higher Edu. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir.1987)).

■ Whether a debtor's circumstances meet the three-prong test for determining undue hardship for discharge of a student loan is a question of law subject to de novo review. *Roberson*, 999 F.2d at 1137. The Bankruptcy Court's findings of fact are disturbed only if this Court finds that they are clearly erroneous. *Id.*

As to the first prong of the "undue hardship" analysis it is evident that the Katzs cannot maintain, based upon their current income and expenses, a minimal standard of living. The Katzs are spending almost $900.00 per month more than their budget will allow. Accordingly, the first prong is met. Defendant–Appellant has decided to focus its challenge to the Bankruptcy Court's ruling on the second prong of the analysis. Consequently, it does not dispute the third prong of the analysis.

■ The second prong requires "evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time." *Brunner*, 831 F.2d at 396. "The second prong ... imputes to the meaning of 'undue hardship' a requirement that the debtor show his dire financial condition is likely to exist for a significant portion of the repayment period." *Roberson*, 999 F.2d at 1135. "[T]he dischargeability of student loans should be based upon the certainty of hopelessness, not simply a

present inability to fulfill financial commitment." *In re Briscoe,* 16 B.R. 128, 131 (Bankr.S.D.N.Y.1981), *quoted in Roberson,* 999 F.2d at 1136.

The Bankruptcy Court erred as a matter of law in determining that the Katzs' circumstances rise to the level of those "additional exceptional circumstances" necessary to satisfy the second prong of the analysis. The Bankruptcy Court reasoned as follows:

> The second prong is there must be additional circumstances indicating that this state of affairs is likely to persist for a significant portion of the repayment period. This is a very good case for that test because we see that for seven years they've been running behind with monthly surpluses [sic]. They had to ultimately file bankruptcy. There were other aids such as qualifying for Badger-Care, which is a low-income health insurance program provided in the State of Wisconsin. And their own history shows that they meet this test and it's likely to continue. And I'm confident that Mr. Katz has used his best efforts to find the best job possible and he has a great record in terms of the average student loan case that I've heard. I'm sure Mr. Hershman would agree, and in fact he did compliment Mr. Katz for this. He's got pretty much continual employment doing the best he can. So that prong is met.

 The requirement that additional, exceptional circumstances exist before a debtor will be allowed to discharge his student loans encompasses "a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Roberson,* 999 F.2d at 1136. On the one hand, where the debtor makes choices that fail to maximize his income and minimize his expenses, any financial hardships that he may encounter as a result are not "undue." There can be no strong suggestion of the debtor's continuing inability to repay to the extent that a debtor's past choices have not foreclosed the opportunity to improve his current financial condition to the point that he is able to maintain a minimal standard of living for himself and his dependents while repaying his loans. On the other hand, factors beyond the debtor's reasonable control that have foreclosed the opportunity to improve his current financial condition should not be held against him.

The Katzs have made a number of lifestyle choices that have failed to maximize their income and minimize their expenses. The Katzs chose to live in a comfortable three-bedroom home in Clear Lake, Wisconsin. The Katzs chose to have two cars, two cell phones in addition to their home phone, and cable television. Mrs. Katz chose to quit a good paying job at F & M Bank to pursue her dream of opening a daycare. And both Mr. and Mrs. Katz chose to borrow money to attend college.

Each of these choices has caused a decrease in income or an increase in expenses. Fortunately, none of these choices has foreclosed the opportunity to improve their financial condition.

For example, the Katzs could chose to sell their house and move closer to Mr. Katz's place of employment. This would save them the vast majority of the $468.00 per month that they currently spend on gas each month. Although the Katz's have not been able to find a buyer for their home, it is unreasonable to believe that the property cannot be sold in the foreseeable future. Mr. Katz testified that the "fair market value" of the property was $90,000.00 to $95,000,000. The fair market value may be less, but there must be a market and a value for the property. The Katzs would not have reaffirmed a

$76,000.00 mortgage for a piece of property that they truly believed to be worthless.

 The Bankruptcy Judge expressed concern that a comparable three-bedroom, one-and-a-half story home would cost considerably more near Bloomington, Minnesota than it would in Clear Lake, Wisconsin. Maybe so, but that is not the proper benchmark. There is no reason why the Katzs need to own their own three-bedroom, one-and-a-half story home. The ability to own one's own home is one of the rewards of financial success, and there is nothing to prevent the Katzs from achieving that success one day. The ability to own a three-bedroom, one-and-a-half story home, however, is well beyond the ability "to maintain a minimal standard of living" by which Mr. Katz's ability to pay back his student loans must be judged.

Moreover, prior to her daycare service Mrs. Katz worked full-time at F & M Bank where she earned $12.50 per hour. She chose to leave her job at the bank to pursue her dream of opening a daycare. There is no suggestion that Mrs. Katz could not now find a job that paid a similar wage to that which she earned at the bank. Even taking into account the added cost of placing their two children in daycare, this one change would increase the Katzs' household income well beyond the point where it would safely exceed current expenses. Mrs. Katz is free to choose to pursue her dream of operating her own daycare, but she cannot then characterize the consequence of that choice—the inability to fulfill financial commitments—as the "certainty of hopelessness" necessary to satisfy the undue burden standard.

Mr. Katz did not choose to suffer a back injury. If such an injury were to prevent him from earning a living, he would have a much stronger case—a circumstance not attributable to any fault of his own—that repayment of his loans imposed an undue burden. To the contrary, Mr. Katz's back has not prevented him from earning a living. His back does not interfere with his job performance at Express Scripts.

 Mr. Katz's back condition does prevent him from working in the field for which he received his education. The record reveals that this is the primary reason why the Katzs believed that Mr. Katz was entitled to have his student loans discharged. Mr. Katz was asked, "And is your request for dischargeability of the student loans based upon the fact that you are not able to work in the field for which you were trained?" Mr. Katz responded: "Yes, partially. That's a big portion of it." Mrs. Katz was asked why the Katzs sought discharge of Mr. Katz's loans but not hers. Was it just the size of the loans? She elaborated:

> No. Actually, what I was told when we had talked about it is because of him having two major back surgeries he isn't able to work in the field that he had studied for, and so with that knowledge that's the only reason why we had gone towards having his discharged is because I don't have a disability. And it was under my assumption that that was the only reason his could be discharged was because of being unable to work in the field that he had trained for.

To the contrary, the Seventh Circuit has specifically rejected the argument that a debtor is entitled to have his student loans discharged if he is unable for any reason to work in the field for which he received his education:

> Congress' decision to increase the availability of higher education through student loans does not necessarily equate to a decision to insure the future success of each student taking advantage of that opportunity. The government guarantees repayment of the loan to the private

502

lender so that those who, because of their current wealth and future earning potential would not be eligible to receive any financing or only financing at a higher rate of interest, may nonetheless receive an education.

The government is not twisting the arms of potential students. The decision of whether or not to borrow for a college education lies with the individual; absent an expression to the contrary, the government does not guarantee the student's future financial success. If the leveraged investment of an education does not generate the return the borrower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow.

*Roberson*, 999 F.2d at 1136–37.

The second prong is not met. There is no additional circumstance to indicate that the debtor's state of affairs is likely to persist for a significant portion of the loan repayment period. As a matter of law the facts as found by the Bankruptcy Judge do not support a finding that the debtor will endure hardship if his student loans are excepted from discharge. The decision of the Bankruptcy Judge will be reversed.

### ORDER

IT IS ORDERED that the decision of the Bankruptcy Court declaring the debtor's student loans dischargeable is REVERSED and that the debtor's debt to the appellant is declared non-dischargeable.